UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JACQUELYN THOMPSON                          CIVIL ACTION

VERSUS                                      NO. 10-182

MICHAEL J. ASTRUE, COMMISSIONER             SECTION "F" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Jacquelyn Thompson, appearing pro se, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Act. 42 U.S.C. §§ 405(g), 423. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

I.    PROCEDURAL HISTORY

Thompson filed an application for DIB on January 17, 2007, alleging disability since August 1, 2004, due to high blood pressure, arthritis, anxiety and depression. (Tr. 79, 153-60, 179). After her application was denied, she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 2, 2008, with a supplemental hearing on November 13, 2008. (Tr. 22-35, 36-79). On January 23, 2009, the ALJ issued a decision denying plaintiff's application. (Tr. 13-21). After the Appeals

Council denied review on August 27, 2009, the ALJ's decision became the final decision

of the Commissioner for purposes of this court's review.  (Tr. 4-7).

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   The ALJ erred by finding that Thompson's impairments are not severe, in violation of the applicable legal standard.

B.   The ALJ erred by failing to consider the aggregate effects of plaintiff's impairments.

C.   Plaintiff's arthritis and stiff fingers do not allow her to do her main job duty, typing.

D.   The ALJ's finding that Thompson could return to her past relevant work is self-contradictory and not supported by substantial evidence.

E.   "The ALJ did not take into consideration plaintiff's positive earnings years to waning earning years with diagnosis of depression at this time as having a negative effect on plaintiff's earning capacity."  Record Doc. No. 13 at p. 8.

III.   ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.   Based on her earnings records, Thompson had sufficient quarters of coverage to remain insured through June 30, 2005.  Thus, she must establish disability on or before that date to be entitled to a period of disability and DIB.

2.   She did not engage in substantial gainful activity from her alleged onset date of August 1, 2004 through June 30, 2005, the date when she was last insured.

2

3.  Through the date last insured, plaintiff had severe impairments of osteoarthritis in the knees and obesity.  However, her alleged impairments of metabolic syndrome, uncontrollable hypertension, frequent gastritis, chest pain, osteoarthritis in the hands and spine, and migraine headaches are not severe.

4.  Through the date last insured, plaintiff did not have any impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  This finding is based on the expert testimony of John S. Murray, M.D.

5.  Through the date last insured, Thompson had the residual functional capacity to perform essentially the full range of light work.

6.  Her medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of her symptoms prior to the date last insured are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

7.  Through the date last insured, Thompson was capable of performing her past relevant work as a transcriptionist as it is generally performed in the national economy.

8.  Alternatively, she is able to perform jobs that exist in significant numbers in the national economy, such as an unarmed security person/surveillance monitor.

9.  Thompson was not under a disability at any time from the alleged onset date of August 1, 2004 through the date last insured of June 30, 2005.

(Tr. 13, 15-20).

IV.   <u>ANALYSIS</u>

    A.   <u>Standards of Review</u>

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005); <u>Waters v. Barnhart</u>, 276 F.3d 716, 716 (5th Cir. 2002); <u>Loza v. Apfel</u>, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Perez</u>, 415 F.3d at 461; <u>Loza</u>, 219 F.3d at 393.  This court may not "rough the evidence in the record, try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  <u>Id.</u>

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See <u>Arkansas v. Oklahoma</u>, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether

substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2008).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1]  The five-step

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."  Martinez, 64 F.3d at 174.

---

claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

B.   Factual Background

Plaintiff, who was represented by an attorney at the first hearing on June 2, 2008, testified that she was 56 years old and had obtained a GED.  (Tr. 28).  She said she was not a medical transcriptionist in 1995 to 1996, but she reviewed medical reports to make sure the doctor had dictated them timely.  She stated that she worked for "Bodgner."[2] (Tr. 29).  She said her job (apparently at a later date) involved picking up anesthesia reports from different floors, climbing stairs, typing, assembling medical charts in the proper order, reviewing reports and making sure that names were spelled correctly. (Tr. 30).  She testified that she stopped working because it became too much for her to handle.[3]  She said she was sick and depressed and she went to work less and less.  (Tr. 31).

Thompson testified that things kept going wrong with her physically and that she was "mentally messed."  She said she kept doing things wrong with the files and could not do her work in a timely manner.  She stated that once she fainted and her "pressure was off."  She said she did not realize that she was depressed at that time, but she is now seeing a doctor for depression.  She testified that she thought "this" started around 2000 and did not get any better.  (Tr. 32-33).  She stated that then "the medicine hit me [and] I

---

[2]According to the record, she worked at Ochsner Hospital.

[3]Plaintiff stated in her Disability Report that she stopped working on May 15, 2002.  (Tr. 179).

. . . woke up worse."  (Tr. 33).  At that point, the ALJ postponed the hearing so he could arrange for a medical expert to testify.  (Tr. 34).

Thompson was again represented by an attorney when the hearing resumed on November 3, 2008.  (Tr. 38).   She testified that, although her employer remained the same, her duties changed at some point.  (Tr. 59).  She said she no longer did transcribing, which was sent out to a private company, and her job consisted of picking up and assembling a certain number of charts per day.  She stated that she had to pull a stack of charts at a time, carry them to her desk and then carry them all to the next person in the assembly process within a certain time period.  (Tr. 60-61).  Plaintiff testified that eventually she could no longer keep up with the other employees because it was wearing her down.  She said her employer tried to keep her at work doing analysis, but the analysis job did not work out for her.  (Tr. 61).

Thompson testified that she was referred to a psychiatrist in 2005 by Dr. Elie Lao, her primary care physician.  The ALJ agreed to hold the record open to receive additional records.  Plaintiff said she later saw a psychiatrist, Dr. Robert Dahmes, but she could not remember the name of the psychiatrist whom she saw before him.  She stated that she started taking depression medicine, prescribed by Dr. Lao, in 2002 or 2003.  (Tr. 70-72). She testified that she saw another psychiatrist, Dr. Robert Detrenis, four or five times, but

8

his treatment caused her to become worse, so she switched to a social worker, Kathie Weber, and then saw Dr. Dahmes.  (Tr. 72-74).

C.      Medical Expert Testimony

John S. Murray, M.D., a medical expert, testified by telephone at the second hearing.[4]  He stated that he has been practicing internal medicine in Austin, Texas, for 25 years and is still practicing.  He said he is somewhat familiar with lymphadenitis, cancers of the stomach and treatment for those conditions, although not as familiar as an oncologist would be.  (Tr. 39).

Dr. Murray stated that he had reviewed the entire record that the ALJ had sent to him.  He said that plaintiff's mental and emotional condition is not his area of expertise, although he treats some patients with mild depression.  (Tr. 40).

Dr. Murray testified that his copies of Exhibit 6F, pages 79 and 81,[5] were partially cut off and therefore undated.[6]  He stated that these records show that Thompson had a

_____

[4]The transcriptionist indicated that Dr. Murray's testimony was inaudible in some places. Where I can ascertain what he said because he was quoting or summarizing a particular medical exhibit in the record, I have inserted the missing words in his testimony from the medical record.

[5]Exhibit 6F consists of 82 pages of medical evidence from Ochsner Clinic Foundation dated March 27, 2007 to March 3, 2008.

[6]The pages are similarly cut off and undated in the administrative record.  (Tr. 382, 384).

carcinoid[7] tumor, for which she had a biopsy, and that there were plans for her to have a second procedure to make sure all of the tumor was removed.  Dr. Murray said he never found any documentation that a second procedure was performed and he does not know whether there was any recurrence or another tumor.  He stated that he would want to know whether there was a second procedure and what the findings were.  (Tr. 41-42).

Dr. Murray testified that Listing 13.16 or 13.17 addresses gastric and small intestinal tumors.  He said the Listing generally requires a tumor that has spread beyond the regional lymph nodes, is inoperable or recurs after a complete resection.  He stated that he cannot conclude that plaintiff met the Listing without additional findings from another procedure.  (Tr. 43).  He said that Thompson had an initial endoscopy, followed by biopsies of the area of the previous carcinoid, but he does not know the results of that routine biopsy.  (Tr. 43-44).  He testified that plaintiff does not appear to meet the Listing based on the available records.

Dr. Murray stated that, other than the concern just discussed, no further medical tests needed to be done for him to form an opinion.  He had reviewed Exhibits 1F through 10F.[8]  (Tr. 44-45).  He testified that plaintiff had medical impairments of

---

[7]A carcinoid is a circumscribed tumor, usually in the small intestine, appendix, stomach or colon. Dorland's Illustrated Medical Dictionary 284 (29th ed. 2000) (hereinafter "Dorland's").

[8]All of the "F" exhibits are medical records and opinions.  Exhibits 11F and 12F were submitted by plaintiff after the hearing.

gastrocarcinoid, chronic hypertension, history of migraine headaches, non-cardiac chest pain and palpitations, chronic anxiety and depression. He said that, if Thompson were his patient, he would probably refer her to a psychiatrist, rather than treat her himself for her longstanding depression and anxiety, which had been treated with a variety of different medications with incomplete responses to some of the medications. (Tr. 45).

Dr. Murray testified that, other than the mental health issues and the carcinoid already discussed, his review of the records did not identify any other Listings that could be met. Leaving aside the mental health issues and the carcinoid, he said that plaintiff's chronic hypertension and migraine headaches did not meet a listed level of severity and that none of her conditions presented functional limitations in the workplace on a consistent or ongoing basis.

Dr. Murray testified that chronic hypertension can be managed with medication and regular follow-up. He stated that migraine headaches, depending on their severity, could be an intermittent source of workplace absenteeism or difficulty with concentration and work performance, but he expected it would only be an intermittent problem. Dr. Murray stated that Exhibit 6F, pages 8 and 9 (Tr. 311-12, report of cardiologist Richard N. Re, M.D., dated February 20, 2008), indicated that Thompson's migraine headaches were stable and under control. He testified that the medical evidence indicated that plaintiff's chest pains were non-cardiac and might be a temporary source of distress or

11

basis to seek medical attention, but there was no documentation of significant cardiovascular disease that would be of disabling severity. Dr. Murray stated that he did not see any problems presenting a major ongoing disability. (Tr. 46).

In response to questioning by plaintiff's attorney, Dr. Murray testified that page 40 of Exhibit 1F[9] (Tr. 264, diagnostic imaging study dated April 16, 2004) contains the results of an x-ray of plaintiff's lumbar spine, which showed mild degenerative changes. (Tr. 46-47). He stated that it is very difficult to correlate the degree of a person's impairment with changes seen on x-rays and that some people with very mild changes on x-rays might have a severe backache, while others might have advanced degenerative changes, but not experience any pain. He said that the hemangioma[10] found at the L-1 spinal level was an incidental finding and that it would not be expected to cause a significant degree of disability in the absence of a fracture at L-1, which is not present here.

Dr. Murray stated that page 66 of Exhibit 6F (Tr. 369) is a record of a CT or MRI scan of Thompson's cervical spine that shows some bone spurs, degenerative changes and mild foraminal narrowing, but no significant spinal stenosis. He testified that these

---

[9] Exhibit 1F consists of 55 pages of medical evidence from Ochsner Clinic Foundation dated September 15, 2003 to March 23, 2007.

[10] A hemangioma is "a general term denoting a benign or malignant vascular tumor." Dorland's at 795.

changes could conceivably be associated with some degree of neck pain, but it is very difficult to correlate the findings to the degree of pain just from the appearance on the scan.  (Tr. 48-49).

When asked what tests he would run if he were concerned about osteoarthritis, Dr. Murray said x-rays can show evidence of arthritis and joint space narrowing, and that blood tests can exclude other sources of arthritis, such as rheumatoid arthritis, but there are no diagnostic blood tests for osteoarthritis.  He stated that the diagnosis is based on medical history, sometimes by x-ray findings and by excluding other sources of arthritis.

Dr. Murray said that Exhibit 1F at page 51 (Tr. 275, consultation report by Jerald M. Zakem, M.D., dated January 8, 2004) includes the type of findings for which he would look, such as tenderness and swelling in the joints.  He noted that Dr. Zakem's report showed that Thompson had a positive ANA result,[11] which he said in some cases might indicate a diagnosis of systemic lupus erythematosus or other connective tissue diseases.  However, Dr. Murray observed that there were no other laboratory tests and

---

[11]ANA is an abbreviation for antinuclear antibodies, which are "antibodies directed against nuclear [i.e., the nucleus of a cell] antigens; ANA against a variety of different antigens are almost invariably found in systemic lupus erythematosus and are frequently found in rheumatoid arthritis, scleroderma . . . and mixed connective tissue disease."  Id. at 70, 99.  An antigen is "any substance which is capable, under appropriate conditions, of inducing a specific immune response and of reacting with the products of that response . . . ."  Id. at 101.  Systemic lupus erythematosus is "a chronic, remitting, relapsing, inflammatory, often febrile multisystemic disorder of connective tissue . . . . [I]t is thought to represent a failure of regulatory mechanisms of the autoimmune system, as suggested by the high level of numerous autoantibodies against nuclear and [other] cellular components."  Id. at 1032.

the clinical picture was not consistent with [inaudible].  He testified that Dr. Zakem suspected the ANA test was a false positive.  He said Dr. Zakem saw evidence of some osteoarthritis in the knees and possibly in the hands, but Dr. Zakem stated that plaintiff's hand problem was primarily in the soft tissue, especially in the tendons, which is common in diabetics.  (Tr. 49).  Dr. Murray stated that Dr. Zakem thought there was some question about osteoarthritis in the hands, but he diagnosed some osteoarthritis in the knees.  (Tr. 49-50).

Citing the statement of the agency disability examiner in Exhibit 3F (Tr. 281-88, Physical Residual Functional Capacity Assessment dated June 14, 2007, completed by a disability examiner, who is not a medical expert) that Thompson has limited abilities in handling and fingering, plaintiff's attorney asked Dr. Murray what limitations Thompson has in her hands.  Dr. Murray stated that the examination by Dr. Zakem, a rheumatologist, in Exhibit 1F at page 51 (Tr. 275) showed that plaintiff had normal grip strength and dexterity, some swelling[12] and cannot fully extend her fingers against each other, so that she has some limitation of motion in extension of her fingers.  Dr. Murray

---

[12]Although the transcript says that Dr. Murray testified that "there's some swelling [inaudible]," the referenced medical record actually says "the hands reveal <u>no</u> soft tissue swelling, erythema or increased warmth." (Tr. 275) (emphasis added).  Erythema is redness of the skin produced by congestion of the capillaries.  <u>Dorland's</u> at 617.

opined that there might be mild limitation of fingering or handling, but he would not expect it to be severe.

When asked whether that limitation would be worsened by plaintiff's metabolic syndrome, Dr. Murray testified that a metabolic syndrome ordinarily would not have a direct effect on osteoarthritis.  He stated that obesity is part of the metabolic syndrome, which might put more stress on weight-bearing joints and aggravate the pain or disability associated with [inaudible], for example, of the knees, hips or ankles.  (Tr. 50).  He said metabolic syndrome is a name for a constellation of symptoms, including diabetes or various degrees of glucose tolerance, chronic hypertension, obesity and high cholesterol. He explained that this group of conditions is recognized as serious because there is a much higher risk of cardiovascular disease when these conditions are together.  He stated that, when a patient has this constellation of symptoms, treatment of the risk factors for cardiovascular disease should be more aggressive to prevent heart attacks and strokes, for which these individuals are at much higher risk than the average population.

Thompson's lawyer next asked about the diagnosis of lymphadenitis in Exhibit 1F at page 36 (actually page 37; Tr. 260-61, report of internist Dr. Lao, dated October 15, 2004).  (Tr. 51).  Dr. Murray testified that lymphadenitis means an enlarged, inflamed lymph node.  He said Dr. Lao stated that plaintiff complained of pain in the neck area

below the angle of the jaw and that Dr. Lao's physical examination revealed a pea-sized, soft tissue mass below the angle of the jaw on the left.

Dr. Murray said that Thompson had a small reactive lymph node. He stated that this typically results from an infection in the same area, such as strep throat, a sore on the scalp or a bad tooth. He explained that the swollen lymph gland would be temporarily enlarged and a little sore, but it would be expected to disappear within two weeks. (Tr. 52). He said it was not likely to be a precursor to stomach cancer. (Tr. 52-53). He stated that, if a person had stomach cancer which spread outside the stomach, it might go into the lymph nodes, but it would tend to go to the lymph nodes in the abdominal region first and then to other organs. He observed that Dr. Lao treated plaintiff's lymphadenitis as a benign reactive lymph node and prescribed an antibiotic. He opined that Dr. Lao would have ordered a biopsy if she had been concerned about plaintiff's swollen lymph node.

Plaintiff's counsel asked why a dual phase scan was ordered for Thompson's neck and thorax in Exhibit 1F at page 32 (Tr. 256, parathyroid imaging results dated February 21, 2005). Dr. Murray explained that Thompson's doctors were checking for

16

parathyroid[13] adenomas,[14] which is usually done when the patient has elevated parathyroid hormone levels.  He stated that the scan was looking for a "hot spot" in the area of the thyroid gland, to check for evidence of a parathyroid adenoma to be removed as a treatment for hyperparathyroidism.  (Tr. 53).  However, he said that the scan found no evidence of an adenoma.

Thompson's attorney asked about the significance of a multinodular goiter,[15] as diagnosed on Exhibit 6F at page 10 (actually at page 9; Tr. 312, report of Dr. Re dated February 20, 2008).  Dr. Murray stated that multinodular goiters are distinguishable from malignancies such as a thyroid cancer.  He opined that a multinodular goiter would not need to be treated unless it was causing an abnormality of the thyroid function or was so enlarged that it was compressing on the trachea.

Dr. Murray disagreed with plaintiff's counsel's characterization of metabolic syndrome as a form of dysfunction.  He explained that metabolic syndrome is a constellation of symptoms and signs, as he discussed earlier, that often go together.  He said his main concern with metabolic syndrome is not the immediate degree of

---

[13]Parathyroid means "situated beside the thyroid gland."  Id. at 1323.

[14]An adenoma is "a benign epithelial tumor in which the cells form recognizable glandular structures or in which the cells are clearly derived from glandular epithelium."  Id. at 28.

[15]A goiter is "an enlargement of the thyroid gland, causing a swelling in the front part of the neck."  Id. at 762.

dysfunction it causes, but the long term risk of cardiovascular disease, such as heart attacks and strokes.  (Tr. 54).  He opined that metabolic syndrome would not be associated with any neoplasm[16] generally or specifically with plaintiff's gastric carcinoid or the possibility of a parathyroid adenoma.  (Tr. 54-55).

Dr. Murray stated that his main concern in treating a person with metabolic syndrome is to make sure she is adequately treated for her conditions, like hypertension, high cholesterol and high blood sugar, to avoid risk factors for the cardiovascular events. He said other concerns in terms of treating Thompson are her history of depression, which might cause him to be cautious about using beta blocker medications to treat her high blood pressure, so as to avoid aggravating her depression.  (Tr. 55).

Excluding the mental health issues, Dr. Murray opined that plaintiff's other issues of gastric carcinoid, hypertension, migraine headaches and cardiac[17] chest pains would not necessarily result in a large number of absences from work.  He stated that he has patients with all of those conditions who do not have a large number of absences.  He

---

[16]A neoplasm is "any new and abnormal growth; specifically a new growth of tissue in which the growth is uncontrolled and progressive . . . . Malignant neoplasms are distinguished from benign in that the former show a greater degree of anaplasia and have the properties of invasion and metastasis. Called also tumor."  Id. at 1184. Anaplasia means "a loss of differentiation of cells and of their orientation to one another . . . , a characteristic of tumor tissue."  Id. at 73.

[17]This is probably a mistake by the transcriptionist or Dr. Murray himself, as the question from plaintiff's lawyer referred to non-cardiac chest pains (Tr. 55), as did Dr. Murray's previous and subsequent testimony.

explained that it would depend on the severity and frequency of a person's continuous, severe migraine headaches, but said he did not see that level of frequency and severity documented in Thompson's medical records.

Dr. Murray said that non-cardiac chest pain would have some occupational effect if the person was going to the emergency room once or twice a week, but that Thompson had two or more episodes of non-cardiac chest pain that were evaluated with a stress test, with normal results.  He stated that non-cardiac chest pain would not cause absence from work unless she was having extreme frequency.  He stated that he has patients with high blood pressure, migraine headaches and occasional non-cardiac chest pains who are fully employed.  (Tr. 56).

Dr. Murray testified that he is familiar with the term "residual functional capacity."  He opined that nothing in Thompson's medical records suggests that she is incapable of performing light work.[18]  (Tr. 57).  He did not think Thompson could perform medium work because of her arthritic problem in her hands, which would make her unable to lift up to 50 pounds, even occasionally, because of pain.  (Tr. 57-58).

---

[18]"Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  A job is also in this category if it involves very little lifting but requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(a).  To be considered capable of performing a full or wide range of light work, the claimant "must have the ability to do substantially all of these activities."  Id.  "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. § 404.1567(c).

Plaintiff's attorney asked Dr. Murray whether it was unusual to see someone of Thompson's age with so many impairments in so many different body systems.  He responded that the carcinoids are somewhat unusual, but that the rest of her problems, including hypertension, depression, anxiety, chest pains and arthritis, are not uncommon.  He said that gastric carcinoids are neither rare nor common.

Upon questioning by the ALJ, Dr. Murray explained that a gastric carcinoid is a tumor of the [inaudible] cells in the gastric gland.  He said these cells produce hormones, including gastrin, which stimulates the secretion of acid by the stomach, and other hormones that work primarily in the gastrointestinal tract.  (Tr. 62).[19]

Plaintiff's attorney asked Dr. Murray to explain a carcinoid syndrome.  He stated that it is a "syndrome of [inaudible] carcinoid tumors of the intestines that produce large amounts of serotonin, which [inaudible] and perspiring, sweating which would be a manifestation of the hormone secreted by a carcinoid tumor."  He opined that such a physical ailment would not necessarily have a direct effect on the degree of depression, but it could aggravate anxiety or depression, depending on how the patient responds emotionally to her physical health.

---

[19]Dr. Murray's testimony on pages 63-64 has too many inaudible gaps to be understandable.

Dr. Murray said that a person's serotonin level does not control depression levels. (Tr. 64). He stated that serotonin sometimes acts as a neurotransmitter in the brain, like dopamine and norepineprine, and that certain pathways in the brain depend more on serotonin, while other pathways depend more on dopamine and norepineprine. He said that the older type of tricyclic antidepressants work more on norepineprine pathways, while the newer antidepressants, "the selected [inaudible] and serotonin [inaudible] inhibitors[20] work more on the [inaudible] pathways of the brain." He stated that those drugs do nothing to affect the total body serotonin levels.

Dr. Murray opined that plaintiff's metabolic condition with the carcinoid syndrome would not directly affect her ability to control her emotions. He reiterated that how a person responds emotionally to her physical health is an indirect connection, but that he would not expect either the metabolic syndrome or the carcinoid tumor itself to have a direct effect on Thompson's depression or anxiety. (Tr. 65).

---

[20]Dr. Murray probably said "selective serotonin reuptake inhibitors," which are "a class of chemical compounds that selectively, to varying degrees, inhibit the reuptake of serotonin by presynaptic neurons and are posited to exert their antidepressant effect by this mechanism." Stedmans Medical Dictionary (27th ed. 2000), on Westlaw at STEDMANS 203950. "SSRIs (selective serotonin reuptake inhibitors) are the most commonly prescribed antidepressants. They can ease symptoms of moderate to severe depression, are relatively safe and generally cause fewer side effects than other types of antidepressants." MayoClinic.com (Mayo Found. for Med. Educ. & Research Dec. 9, 2010), http://www.mayoclinic.com/health/ssris/MH00066, last visited Dec. 20, 2010.

D.   <u>Vocational Expert Testimony</u>

A vocational expert, Cindy A. Harris, testified at the hearing.  She stated that plaintiff's past relevant work as a transcriptionist is generally performed at the sedentary, skilled level, according to the <u>Dictionary of Occupational Titles</u>, but that plaintiff actually performed it at a light to medium level because she frequently handled 15 pounds and occasionally handled up to 30 pounds.  (Tr. 58-59).  Harris testified that Thompson has skills in typing, clerical duties, transcribing, recordkeeping and proofreading.  (Tr. 59).

Harris opined that a hypothetical person who could perform sedentary and light work could perform plaintiff's past relevant work as a transcriptionist as it is normally performed in the national economy.  She said there are 1,500 such positions available in Louisiana and 99,000 in the United States.  (Tr. 76).  She testified that such a person could also perform light jobs, such as cashier, of which there are 20,000 light, semi-skilled jobs in Louisiana and 966,000 in the national economy.  (Tr. 76-77).

Upon cross-examination by plaintiff's attorney, Harris said that both jobs would be eliminated if the hypothetical individual was moderately limited in her fingering and handling, with "moderately" defined by the attorney as more than occasional non-function of both upper extremities.  She testified that both jobs would also be eliminated if the person was absent from work more than twice a month.  (Tr. 77).

22

The ALJ modified the attorney's hypothetical to delete the issue of absences and to address only the moderate limitations on fingering and handling.  Harris testified that this limitation would not eliminate all jobs.  As an example of an unskilled, light occupation that would allow for that restriction, she mentioned an unarmed security person or surveillance monitor, of which there are 1,300 in Louisiana and 75,000 in the United States.  (Tr. 77-78).  The ALJ redefined "moderate" to mean that the restriction would interfere with, but not preclude, the performance of light work.  Harris testified that such a restriction would not preclude the person from working, and that she had answered the question originally based on how plaintiff's counsel had defined the term "moderate."  (Tr. 78).

     E.    <u>Medical Evidence</u>

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 15-19).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

F.     Plaintiff's Appeal

    1.     The only relevant time period is from the alleged onset date through the date last insured.

Thompson applied for DIB, alleging an onset date of August 1, 2004. She was insured for DIB only through June 30, 2005. "Thus, to prove that she is entitled to disability benefits, [plaintiff] must not only prove that she is disabled, but that she became disabled prior to the expiration of her insured status." Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992) (citing 42 U.S.C. § 423(a), (c)) (emphasis added); accord Brunson v. Astrue, 387 F. App'x 459, 460 (5th Cir. 2010); Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008); Hernandez v. Astrue, 278 F. App'x 333, 338 (5th Cir. 2008); 20 C.F.R. §§ 404.315, 404.320, 404.131(a). "Evidence showing a degeneration of a claimant's condition after the expiration of his Title II insured status is not relevant to the Commissioner's Title II disability analysis." McLendon v. Barnhart, 184 F. App'x 430, 432 (5th Cir. 2006) (citing Torres v. Shalala, 48 F.3d 887, 894 n.12 (5th Cir. 1995)); accord Dominguez v. Astrue, 286 F. App'x 182, 185 (5th Cir. 2005). A claimant who becomes disabled after the expiration of her insured status is not entitled to DIB. Id. at 186; Cook v. Astrue, No. 7:07-CV-0170-BF, 2008 WL 4454044, at *6 (N.D. Tex. Oct. 2, 2008) (citing 42 U.S.C. §§ 416(i)(3), 423c; Oldham v. Schweiker, 660 F.2d 1078,

1080 (5th Cir. 1981)).   Thompson therefore must show that she was disabled <u>as of</u> June 30, 2005, the date she was last insured for DIB.

Much of plaintiff's memorandum in this court focuses on medical records and diagnoses dated <u>after</u> June 30, 2005, some of which were nonetheless reviewed and considered by the ALJ and/or the Appeals Council.   However, any records dated after June 30, 2005 are relevant in this case only to the extent they might establish that Thompson was disabled <u>as of</u> that date.   To the extent that medical evidence "related to a period after [June 30, 2005], the end of plaintiff's coverage period . . . . , [the evidence] did not describe [her] condition during the relevant time-frame." <u>Halley v. Barnhart</u>, 158 F. App'x 645, 648 (5th Cir. 2005); <u>accord</u> <u>McLendon</u>, 184 F. App'x at 432.

> 2. The ALJ correctly applied the applicable legal standard and did not err by finding that plaintiff's impairments are not severe.

At the second step of the sequential evaluation, the ALJ found that, through the date last insured, plaintiff had the severe impairments of osteoarthritis in the knees and obesity.   He found that her impairments of metabolic syndrome, hypertension, gastritis, chest pain, osteoarthritis in the hands and spine, and migraine headaches are not severe. Thompson's pro se memorandum does not contain much argument, but she appears to contend that the ALJ erred by failing to find that all of her impairments are severe.

In the Fifth Circuit, an impairment is considered non-severe if it is "'a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" Loza, 219 F.3d at 391 (quoting Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985)) (internal quotation omitted).   The ALJ in the instant case cited the relevant standard and explained, based on substantial evidence, why he found that plaintiff's impairments other than osteoarthritis in the knees and obesity were not severe.

When the ALJ has proceeded beyond step two to find the plaintiff is not disabled at a subsequent step, plaintiff's argument that the ALJ failed at step two to find that a particular impairment is severe

> is inapposite because the ALJ did not [deny] plaintiff's benefits based on a finding that her impairments are not severe.   See Chapparo v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987) (argument regarding improper application of Stone standard irrelevant to disposition of case if outcome of case [did] not turn on issue of severity); see also Shipley v. Director of Health and Human Services, 812 F.2d 934, 935 (5th Cir. 1987).   The ALJ's report contains a statement of the Stone standard and a determination that as it applied to this case, [one of claimant's several alleged impairments] is a severe impairment. . . .   The ALJ then proceeded to the next step of the sequential evaluation and assessed whether an impairment or a combination of plaintiff's impairments met or exceeded the severity of the impairments listed in the appendix.   See 20 C.F.R. § 404.1594(f)(2).   In the absence of a "non-severe" finding as to any one of plaintiff's impairments and a decision to [deny] plaintiff's benefits based on a "non-severe" finding, plaintiff cannot complain that any prejudice resulted from the ALJ's performance at this stage in the evaluation.   See Brock v. Chater, 84 F.3d

726, 729 (5th Cir. 1996) (decision will not be reversed where claimant makes no showing that she was prejudiced by deficiencies she alleges).

Lawrence v. Barnhart, No. 01-1366, 2002 WL 356316, at *2 (E.D. La. Mar. 4, 2002) (Vance, J.); see also Bradshaw v. Astrue, No. 1:07-CV-0150-C, 2008 WL 4387087, at *6 (N.D. Tex. Sept. 26, 2008) (citing Robinson v. Barnhart, 183 F. App'x 451, 455 (5th Cir. 2006); Reyes v. Sullivan, 915 F.2d 151, 154 n.1 (5th Cir. 1990); Chapparo, 815 F.2d at 1011) ("In more recent cases, the Fifth Circuit has found no merit to claimants' arguments of ALJ error arising out of the failure to correctly apply or state the Stone standard where the sequential evaluation process proceeds past step 2.").

Having found that Thompson had two severe impairments, the ALJ proceeded through subsequent steps of the evaluation, considered all of the evidence concerning her medically determinable impairments and found at the fourth step that she is capable of performing her past relevant work.  The ALJ's failure to find at step two that plaintiff's other impairments were severe is irrelevant and non-prejudicial to plaintiff.  Accordingly, this assignment of error is meritless.

> 3.    The ALJ considered the aggregate effects of plaintiff's impairments.

> 4.    The ALJ considered plaintiff's job duties and her allegations of arthritis and stiff fingers.

These two assignments of error are evaluated together because both relate to the ALJ's findings concerning plaintiff's residual functional capacity.  Thompson argues that

27

the ALJ erred by failing to consider the aggregate effects of her impairments.  She also contends that she suffers from arthritis in her hands and stiffness in her fingers that preclude her from typing, which she states was the major duty of her past relevant work as a transcriptionist.  The ALJ found at the fourth step of the sequential evaluation that, prior to her last insured date of June 30, 2005, Thompson had the residual functional capacity to perform essentially the full range of light work activity.  The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of her symptoms are not credible to the extent they are inconsistent with that residual functional capacity assessment during the relevant time period.

The ALJ stated several times that he had considered the entire record and the combined effects of all of Thompson's impairments.  (Tr. 14, 15, 18).  His finding concerning her residual functional capacity is substantially supported by the evidence, including the medical expert testimony, to which the ALJ assigned "significant weight . . . because it is well supported by the treating medical records prior to the date last insured."  (Tr. 19-20).

The testimony of an expert in the appropriate medical field concerning a plaintiff's abilities to perform work-related activities, when the testimony is based on substantial evidence in the medical record, is itself substantial evidence on which the ALJ can rely.

Sanchez v. Astrue, 265 F. App'x 359, 361 (5th Cir. 2008); Halley, 158 F. App'x at 647-48; Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995). In the instant case, Dr. Murray accurately summarized the medical evidence, answered the questions of the ALJ and plaintiff's counsel, and rendered his expert opinion why Thompson's medical impairments would not preclude her from performing light work. As to plaintiff's alleged arthritis and stiffness in her fingers, Dr. Murray opined that she might have some mild limitation of fingering or handling, but he would not expect it to be severe. (Tr. 50). His opinions are based on the substantial medical evidence that he cited in his testimony.

Dr. Murray's testimony was not contradicted by any other medical evidence, including the evidence that plaintiff submitted to the ALJ after the hearing. (Exhibits 11F and 12F, Tr. 418-37). Some of the later-submitted evidence consists of medical records from 2000 and 2001 (Tr. 429-36), three to four years before Thompson's alleged onset date, when she was still working and not disabled. Those records are not relevant.

Similarly, the additional records from plaintiff's internist, Dr. Lao, dated from August 26, 2005 (two months after her date last insured) through December 14, 2006 (18 months after her date last insured), are largely immaterial because they significantly post-date the relevant time period. (Tr. 419-27). To the extent that Dr. Lao's August 26, 2005 report might relate to the relevant period of August 1, 2004 through June 30, 2005, that report confirms that plaintiff did not complain of any pain or stiffness in her hands. Dr.

Lao stated that Thompson's hypertension and gastric reflux disease were stable on medications.  Dr. Lao diagnosed anxiety with depression and she "start[ed]" Thompson on alprazolam[21] and Lexapro,[22] indicating that plaintiff had not been treated with any medications for anxiety or depression during the preceding months.  Dr. Lao did not diagnose arthritis or any problems with plaintiff's hands.  (Tr. 419).

There are only two earlier mentions of mental health problems in the medical records from the relevant time period.  The first was on September 20, 2004, when Dr. Lao noted that plaintiff had a past medical history of depression and anxiety.  However, Dr. Lao neither diagnosed nor prescribed any treatment for those conditions.  (Tr. 267).

The second mention of mental health issues was on April 7, 2005, when Thompson went to the emergency room with complaints of anxiety and heartburn.  She denied any depression.  The emergency room physician stated that he discussed her "long history of anxiety," but she was not currently being treated for it.  The doctor diagnosed

---

[21]Xanax (generic name:  alprazolam) "is an antianxiety medication, belonging to a drug class known as benzodiazepines.  Xanax is used for the management of anxiety disorder, for short-term relief of anxiety symptoms, and panic disorder."  <u>PDRhealth.com</u> (PDR Network, LLC 2010), http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Xan1491.html&contentName=Xanax&contentId=839 (last visited Dec. 19, 2010).

[22]Lexapro (generic name:  escitalopram oxalate) "is indicated for the acute treatment of Generalized Anxiety Disorder (GAD) in adults.  Generalized Anxiety Disorder is characterized by excessive anxiety and worry (apprehensive expectation) that is persistent for at least 6 months and which the person finds difficult to control."  <u>Physicians' Desk Reference</u> 1161 (64th ed. 2010).

anxiety, gave Thompson a prescription for "low dose Xanax" and instructed her to follow up with her primary care provider. (Tr. 239-41).

A claimant's lack of need for medication or failure to seek treatment is a relevant factor to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations. Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990). The substantial evidence of record does not establish that Thompson suffered from anxiety or depression of disabling severity as of her last insured date. As the ALJ found, all of the other medical records concerning possible worsening of plaintiff's mental health are dated too long after her last insured date to be relevant to her instant application for DIB.

Accordingly, this assignment of error lacks merit.

5.      The ALJ's finding that Thompson could return to her past relevant work is not "self-contradictory" and is supported by substantial evidence.

Step four "directs a finding that the claimant is not disabled if the claimant's impairments do not 'prevent [the claimant] from doing past relevant work.'" Leggett, 67 F.3d at 564 (quoting 20 C.F.R. § 404.1520(e) (1995)). Plaintiff argues that the vocational expert did not testify about the job demands of her past relevant work and did

not refer to the Dictionary of Occupational Titles or other relevant sources.  Thompson also contends that the ALJ made no specific findings about the demands of her past job as a transcriptionist and that her job should have been classified as medium level of exertion because she lifted as much as 25 pounds.

These assertions find no support in the record.  On the contrary, Harris, the vocational expert, testified that a person with the residual functional capacity to perform light work is capable of performing plaintiff's past relevant work as a transcriptionist at the sedentary level, which is how the job is generally performed, as defined in the Dictionary of Occupational Titles.  Harris also testified that Thompson actually performed her past job at a light to medium level, based on the weight that she lifted.

Although the ALJ found that plaintiff cannot perform medium work, "[t]he mere inability of a claimant to perform certain requirements of [her] past job does not mean that [s]he is unable to perform 'past relevant work' as that phrase is used in the regulations; rather, the Commissioner may also consider the description of the claimant's past work as such work is generally performed in the national economy."  Leggett, 67 F.3d at 564-65 (quotation omitted) (emphasis added); see also Orphey v. Massanari, 268 F.3d 1063, 2001 WL 877596, at *1 (5th Cir. 2001) (quotation omitted) ("To determine whether [plaintiff] could perform her past relevant work, the ALJ was required to assess the physical demands of that work.  This determination may rest on descriptions of past

work as actually performed or as generally performed in the national economy.  ALJs may take notice of job data in the Dictionary of Occupational Titles . . . .").  Therefore, the ALJ did not err in finding that plaintiff could perform her past relevant work as a transcriptionist, as that job is generally performed in the national economy.

      6.    <u>Plaintiff's final assignment of error concerns an irrelevant time period.</u>

Finally, Thompson contends that the "ALJ did not take into consideration plaintiff's positive earnings years to waning earning years with diagnosis of depression at this time as having a negative effect on plaintiff's earning capacity."  Record Doc. No. 13 at p. 8.  She appears to argue that the ALJ failed to consider that her earnings declined as a result of depression during the last few years that she worked.

Thompson stopped working in 2002, but her alleged onset date is August 1, 2004. Thus, whether she suffered from depression or declining earnings during the last years that she worked is irrelevant to a determination whether she was disabled between August 1, 2004 and June 30, 2005.

<u>CONCLUSION</u>

The ALJ did not err by finding that certain of plaintiff's impairments are not severe.  The ALJ considered the aggregate effects of plaintiff's impairments, including her allegations of arthritis and stiff fingers.  Substantial evidence supports the ALJ's finding that Thompson could return to her past relevant work as it is generally performed.

Plaintiff's contention that she suffered from depression and declining earnings during the last years that she worked is irrelevant and the ALJ did not err by failing to consider it.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[23]

New Orleans, Louisiana, this ___22nd___ day of December, 2010.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[23]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.